Mr. Mosley, good morning.  May it please the court, I'm Thomas Mosley, counsel for the petitioner Mr. Singh. With the court's permission, I'd like to reserve five minutes for rebuttal. The first issue. Can I ask you a question just at the outset that I just don't understand? And I'm sure you or your opposing counsel can answer for me. There was a kickback scheme, and the Port Authority paid a check or checks, and they were cashed by the supposed partner who turns out to be the person conducting the investigation, or part of the team conducting this investigation. And he cashes the checks, which include the kickbacks, which let's assume for the moment is $54,000, is the kickback part, and turns the money immediately back over to the Port Authority. Is that correct? That's correct, Your Honor. Did the Port Authority ever give the money? It looks like it may have given that back to the trustee. Yes, the Port Authority turned that over to the trustee, promptly turned that over to the trustee. That's shown at 163 of the certified record. In other words, this money at all times was never under Mr. Singh's control. It was in the custody, I might even say in custodial legis of the person who was cooperating with the government, and then it was turned over to the trustee. And just a dumb question. Why was it turned over to the trustee if it was an illegal kickback? It wasn't an illegal kickback, Your Honor. I should have corrected that point. What this was were receivables for work that Mr. Singh, Mr. Singh's company had done that were, the money was actually paid, the money was actually paid to the rebar company which did the work. Mr. Singh was involved in that. Mr. Singh thought that was a proper receivable for him. Regrettably, he didn't include it in the schedule, but that money was considered to be an asset of rebar construction. And since it was an asset of rebar construction, what happened here was that it was turned over. It was never in Mr. Singh's possession. The confidential informant had it, the government agent. It went to the trustee, and the trustee distributed it as part of the distribution that he made. So I guess to take my argument on loss first, even if we adopt the government's Feldman test, even if we adopt the government's Feldman test, what happened here, if Mr. Singh had acted lawfully, actually took place because the money, if he'd acted lawfully, the proceeds would have been disclosed on the schedule. They would have been turned over to the trustee, and the trustee in terms of his distribution would have made the distribution. And that's precisely what happened. If you take Feldman, which in effect is a comparison, what did the estate lose with regard to what happened illegally versus what it would have gained if things were done legally? It sounds like it's $54,000 minus $54,000 equals zero, and so there can't be a $10,000 loss. Exactly. That's precisely our point with respect to loss here. But you don't dispute that the offense at least involved deceit? Well, I suppose if I succeed on loss, I don't have to make that argument. And obviously Kalashima, which is the 500-pound gorilla in the room that I have to address, doesn't make my life any easier. I would in that regard. I'm getting into all the fraud stuff. Let's just take deceit by itself. Right. Isn't that really there? Maybe I'm being unfair. Well, I think what's important to recognize here is how deceit arises in connection with the Second Circuit precedent interpreting this 18 U.S.C. 1523. Should we use the Second Circuit or should we use our? Well, I think you should use the Second Circuit because that's where the conviction occurred. That's where in terms I think the reliance entrance of a negotiated plea, and I think the Criminal Defense Council here did his best to try to negotiate a plea that would not make Mr. Singh removable. You should use the Second Circuit precedent. And I think that precedent from going all the way back to the Robinson case up through the case that the government cited in its Rule 28J submission, talks about deceit not in terms of trying to get something from somebody, but rather the integrity of the process. In fact, they reject the jury charge that would have had deceit in the sense of trying to acquire something. So I think we really are dealing with a, I think we really are. The definition of the plea was the Second Circuit definition that he used. Right. Exactly. And that was the, those were the elements that were elicited. And the sentencing was under the perjury. Yes, the sentencing, the government actually specifically agreed during the sentencing phase that the perjury guidelines should be the ones controlling and not the guidelines for crimes involving fraud or deceit. In fact, didn't the government admit at sentencing that the crime really didn't affect the bankruptcy? Yes, that there was no substantial, that there was no substantial impact upon the bankruptcy, on the bankruptcy process. And I think a further distinction from Kawashima is that Kawashima is addressed to a specific victim. It's addressed, you know, as Judge Alito, then Judge Alito said in his dissent in Lee, which is obviously now more relevant, that we have a, it's addressed to the U.S. Treasury as a victim here, while 152.3 is addressed to the integrity of the, integrity of the bankruptcy process. You know, if we look beyond the restitution order and plea agreement, aren't we sort of re-litigating the conviction or the plea there to a degree? Well, I. If we establish that precedent, you know, isn't that a problem? I think we have to talk first about the loss issue. With respect to the loss issue, I don't think you are, because among other things, we're dealing with a circumstance-specific test that, that Nachowen compels. And the restitution order here was ordered, and I think it's pretty clear, because the Criminal Defense Council wanted to get extra credit, so to speak. Ironically, if you look at the actual judgment of conviction, which imposes that restitution, and I think it's at page 195 of the certified record, that actually specifically says that it's done pursuant to a plea agreement and notes that, notes under the loss calculation zero. So, I mean, I think Nachowen really. Did he agree to have restitution for $54,000 if there wasn't any loss? He, well, first of all, you can do that, Judge Ambrose, under 18 U.S.C. 366A3 as part of the plea agreement. And that's what, that was agreed. He did that to get credit, as he noted in his sentencing. He noted in his sentencing memorandum, I think that's at page 292 of the record, he did that to get additional credit and to push off the, excuse me, try to get it under a jail sentence. What he got here, in terms of the jail sentence, ultimately was 10 years, excuse me, 10 months. And we argue that that wouldn't make him deportable under the perjury section, subpart S. And just very briefly on that one other distinction, I think that unlike the Bob case, of course, in which the government relies heavily, Congress could not have added subpart S in the belief that it was adding perjury statutes that didn't have fraud as an element. Because fraud, historically, I would submit, has never been an ingredient of fraud or deceit, has never been an ingredient of the perjury statute. So we really are, I think, now looking at a situation where an adding S, Congress carved out a specific exception for perjury, a specific provision for perjury that required a sentence of one year. I mean, ironically, it is somewhat more like Kawashima, where the court held that in the M2 situation, they were really carving out a specific thing that would not have been encompassed within fraud. And I think that's similarly the case here. And then finally, if any doubts on the construction that we've urged here, both the majority and the dissent in Kawashima recognize the application of the rule of lenity or narrow construction in a case like this. The creditors suffered no loss. The creditors suffered no loss. Did the bankruptcy estate or the trustee suffer a loss? That is, can they be defined? Do they fall within the definition of victims? I would urge not under these circumstances, particularly because they made no claim that there was any extra effort involved in doing this. This was easily turned over from the port authority to the trustee. The trustee didn't have to do any extra work, much less a $10,000 loss of extra work. Yeah. What if it had happened a year after the plan had been confirmed and so forth? Not that that was the case. Well, I don't think you have to go that far to sustain the position that I'm taking here now, because at all times, this was under the custody and control of a government agent. Thank you. No further questions, all. Thank you very much. Good. Mr. Bless. Good morning. Good morning. My name is Jesse Bless. I represent the Attorney General of the United States. Do you want to put that mic up just a tad? Can you hear me? Are we good? It's better. All right. Why don't we start with loss, because it looks like 54,000 minus 54,000 is zero. Well, that's, of course, because he was caught, and we're not looking. We're not looking. We're trying to put a requirement on the statute that says if the money is returned by an order of restitution, as it was in Nijuan in the Supreme Court, then there can be no loss. Of course there's a loss. He was ordered to be paid. And in this case ---- But you're saying actual loss. You're not saying ---- I'm not relying on potential loss. This is an actual loss. If you look at what happened, when he files the petition, it's 2005. He then goes and asks someone, because his assets are frozen, and this is very similar to what happened in Feldman, not factually, but concealment. He says, go cash $54,000 worth of checks that my creditors and the trustee, as the fiduciary to the creditors, is entitled to. But he goes and seeks someone to cash that 54,000 for him. Now, at that point, that's the harm. That's the crime. That money should have been the estate's money, right? Four years. And then four years later, when he's prosecuted, and again, by terms of the plea, is ordered to pay the restitution. That's four years. There's no temporal limitation for actual loss. That actual loss occurred. The fact that he got caught didn't change that result. It might have benefited the creditors, as it did in Feldman, when Feldman was caught. What's the timing here? He files? Files bankruptcy. Files a statement not disclosing this $54,000. Correct. And that's 2005. 2005. And the checks were cashed shortly thereafter? I don't have the exact date. Was it 2005, or was it four years later? It would appear to record the record of conviction and the circumstances that are reflected in the record. The temporal limitation, the time is not there. He's prosecuted in 2009. But when did he, when were, well, we know when the checks were cashed because it would, you know, you would trace that. So when were the checks cashed? I would expect that they were after he filed the bankruptcy petition because his assets had been frozen. How soon thereafter? Roughly weeks, days, weeks, months? The record does not reflect that. But after the checks were cashed, they came back. Obviously the person who was part of the Sting operation cashed the checks, gave the monies to the Port Authority, and the Port Authority gave those monies to the estate. Almost, it was the tinkers, there was a chance it happened very quickly. Did it not? No. He, in fact, had to be prosecuted first, though. It wasn't as if the Port Authority said, oh, this money doesn't belong to him, it belongs to, this required a criminal charge and a conviction for the creditors to get the money they were owed, just as it did in Nijuan. When the petitioner in Nijuan committed wire fraud and there was a million dollars of loss to the victims, you know, no one, there's no charity, the judge, the trial judge, or the prosecutors in a charitable position. There's an order saying, sir, you've defrauded these victims, the losses in excess of $10,000. This is an order of restitution to compensate for the losses that they sustained. What he's trying to do is say, if we make right by an order of restitution, what the petitioner is trying to say is, if we make right by an order of restitution the loss, so that at the end all things square. But what Nijuan says, we must look at the facts and circumstances underlying the conviction. Correct. And the facts and circumstances here are that the creditors didn't lose a dime, ultimately. That's the critical, the critical word is ultimately. Because he was not successful. Because the crime, there were actual losses for a period of time. It required a conviction for those creditors to be made whole. If he had succeeded, those creditors would have been defrauded of $54,000. To qualify as an aggravated felony, the offense must result in a loss to the victim exceeding $10,000. Yes. The victim here would be, in effect, the estate. Yes. And ultimately the creditors. Yeah, the fiduciary. And the victim didn't lose anything. If you look at the Feldman calculation, we're looking at. . . The Feldman comparison is what happens, what did the state lose or what did the parties lose, the victims, when there was illegal conduct versus what they would have gained if there was legal conduct? And here the answer is zip. No. I disagree. Ultimately that may have been the case. But for a period of four years, there was. . . If he had acted lawfully, he would have disclosed immediately to the bankruptcy, in the bankruptcy proceeding, $54,000. That's what would have happened if he acted lawfully. That $54,000 would have been there. What he did, the harm caused, was he concealed that $54,000. Now, because he got caught, ultimately. . . And in Feldman they didn't make this distinction that the petitioner is trying to make here. Because the creditors were ultimately compensated, that didn't change the loss. The loss occurred. It's just that by the grace of the restitution and the prosecutor, that if whatever was recoverable was paid. Now here's the interesting point. If there was no actual loss, there would have been no need to plea or to make an order of restitution. Hasn't the Second Circuit said that you don't look at intended loss? Yes. And again, Pierre is distinguishable. And let me draw you to the factual circumstances of Pierre. In Pierre, in here, we don't know the. . . I mean, in Pierre, the petitioner went to a bank and said, I'd like a mortgage for $500,000. The bank, and through fraudulent conduct, the bank catches, never discloses the funds. The bank suffers no loss. The bank is the victim. Taking it from the perspective of the creditors, in this case, the creditors are sitting there saying, we're entitled to these debts. We're entitled to $54,000. The petitioner hides those assets for a period of years. The creditors are left to suffer those actual losses for that entire time. There would have been no need for a restitution order if the creditors were not somehow harmed. The harm occurred. What I think is difficult is the bankruptcy proceeding here. And so we're not looking at intended losses. We're looking at what actually happened, what actually happened in this case. That's what concerns me, what actually happened here. I have difficulty in seeing how you come out with an aggravated felony here with a loss to the victim exceeding $10,000. So you would say in Feldman, when the person hid those assets from the bankruptcy, that there was no loss because ultimately the creditors got the money. No, but Feldman says, quote, we must compare what actually happened with what would have happened if Feldman had acted lawfully. So it sounds like your case is he lies about the $54,000, and he gets the money, and he blows it. And it never comes back into the estate. Clearly, that's more than $10,000. But in this case, he lies about the money. The money comes back into the estate penny for penny, and it's distributed to the creditors exactly like it should be because it's not going to be distributed early. It's only distributed later on when you have a plan or a liquidation under Chapter 7. And so you've got a much different situation. Maybe it's serendipity, but there was no actual loss to the estate, and there was no actual loss to the creditors of the estate. So what you're suggesting, let me just make sure I'm clear. If a convicted individual pays restitution penny for penny, there's not an actual loss. Well, he didn't have to pay restitution. It came back anyway. Well, certainly there's a restitution order there. So if the petitioner in Nijuan – But what I'm looking at is the definition of aggravated felony. Exactly. In Nijuan, if the petitioner in Nijuan accounted for the loss of his wire fraud penny for penny, then he wouldn't have been found to be an aggravated felon. And, in fact, there was a restitution order there, and he agreed to pay the restitution order just as the petitioner did in this case. But Mr. Mosley has explained why he agreed to the restitution order for the purpose of sentencing. Amazingly, it reflects the – It's a significant benefit by doing so. And that may be true, but what's amazing is it reflects the exact amount of cash that was – Was there double counting here? Did he actually – in addition to the monies being paid over by the Port Authority, $54,000, was there also, pursuant to the restitution order, another $54,000 paid over to the estate? No. So there was no – Not that the record reflects. There was no double reward. You're not saying – Your position is not that the creditors were delayed in payment, or are you saying that? I can answer that for you. The answer is no. No. What we're saying is that the crime caused a loss. Now, although the loss was ultimately recovered, the actual loss existed. And let me bring you back to Feldman, please. In Feldman, the person hid assets that belonged to the trustee and then the creditors. Those were recovered. But as this court said in Feldman, what would have happened had he acted lawfully would have been much different. You know, so that ultimately in the bankruptcy proceeding, just because it ultimately finds its way back by reason of investigation in the criminal justice system, those losses exist. There's no – so that we don't do an accounting at the end of a conviction. The harm occurs at the time the crime is committed. So that in Pierre, when the bankruptcy fraud was committed – Exactly, exactly. And it's not – we don't do the accounting at the end. We do the accounting at the time he commits bankruptcy fraud. Now, I want to make that point again. We look at the actual losses at the time the bankruptcy fraud is committed, not when the – not accounting at the time it's sentenced. But is that how Feldman instructs us to do so? I believe it does. It says what would have happened had he acted lawfully versus what actually occurred. Now, what would have happened had he actually – had he acted lawfully? What would have happened is those $54,000 in assets, he wouldn't have tried to cash. In fact, he would have put them either into the corporation's account or his own account and write in – and we don't have a crime. What actually happened is those $54,000 – You're saying we can't – the facts here are somewhat unique. But you're saying we can't – if we establish this precedent, we really can't limit it to just this case. And everybody who turns around and ultimately pays back the restitution is going to claim the benefit of it. Exactly. Because that's what restitution tries to do. It tries to make – compensate victims. And in some cases that takes place, and that's great. But it's really insignificant for purposes of determining whether an aggravated felony has been committed because what an aggravated felony says is that whether the offense involves fraud that caused a loss, it did. Now, ultimately, the creditors were okay, but that wasn't because of he went back on his crime or there was only a false attempt. There was a completed crime here. The completed crime was the deceit, the bankruptcy fraud, the $54,000 he stared away from the fiduciary, who didn't have it. I've still got a problem with Feldman because Feldman says, quote, the amount of restitution awarded is limited to the amount of actual loss caused by the defendant's crime. The actual loss. Yeah. And it's hard for me to – when just common sense says that the actual loss to the victim here was zero. I think conceptually. What you're saying is that at the minute he made the false statement that he was hiding $54,000, there was an actual loss at that minute, and that's when you stop the clock. You don't look beyond that. Forget it. Need You 1 supports that, and I win. That's what you're saying. Well, I mean, it's not me, but yeah. That you look at the offense that involves fraud or deceit that caused a loss. Now, caused a loss. Now, there's no – put it this way. There's no savings clause in the aggravated felony definition. That's probably a better way to say it. There's no savings clause. There's no, well, if you make good before you're sentenced, we'll forgive you. But it sounds like in this case the making good was way before the sentence. Because he turned the checks over to a CI. Does it matter that the situation was rectified by a third party here and not by the defendant himself? No, because he didn't have to gain to commit the crime. He had to conceal to commit his crime. That's what caused the loss. That money that he concealed belonged to others who deserved the benefit of the monies well before the person was prosecuted. You're right with respect to 152.3. But are you right with respect to what is an aggravated felony under 1227? In other words, he committed the crime when he concealed under 152.3. But did he commit an aggravated felony under 1227 when, as it turns out, the actual loss to the state was not any amount at all? If I may answer on my time? Yeah, you sure can. Yes. And the reason the loss occurred is notwithstanding that it was ultimately paid back because we know that restitution is ordered and is properly relied upon to determine the amount of actual loss, as the Supreme Court said in Nijuan. If the petitioner in Nijuan had paid back the money pursuant to a plea, it wouldn't have changed the result in that case, and it shouldn't change the result here. The restitution was ordered because it caused actual losses that involved by reason of fraud. I don't think Nijuan says that. I think it says, again, you look at the specific circumstances, and I don't see how that's limited to a plea agreement or restitution. No, no. What I mean is in Nijuan they relied on a restitution order. And taking the comments from the panel, if it were true that there would be more issues involved, meaning that if this court were to hold that a restitution order that's paid does not cause an actual loss so that the victims, if they're made whole, there's no actual loss, then the Supreme Court would have had to have gone much further and determined not only was the order to pay restitution, but was the restitution paid. It would add another hurdle beyond what was considered in Nijuan. Nijuan stopped at the restitution order. They didn't look at whether the restitution order was ultimately paid or the victims were ultimately made whole because whether that takes place does not change that the actual losses did occur for a period of time. Thank you very much. Good. Thank you very much, Mr. Bless. Mr. Mosley. Just very briefly. Senator, if I could just say, he's saying that if we follow your approach, we're going to create a situation, a precedent. It's going to create a situation in which every time somebody pays restitution immediately or maybe even over a period of time, there will not be a violation of this offense. Do you follow what I'm saying? I certainly do, and let me suggest to you. Why won't that happen? It won't happen because of the unique facts and circumstances of this case. First of all, these receivables were always within the custody of the government. In other words, the government had control of them. They were in custodia legis because they were in control of a cooperator who was an agent of the government. Secondly, I think we have to calculate loss in terms of the unique facts and legal circumstances of this case. We have a bankruptcy proceeding. And as the Feldman test says, the issue is what happens if the debtor, what's the difference, if any, between the debtor behaving lawfully and unlawfully? And in this case, there really is none because we have a bankruptcy distribution. So if we take these two principles together, we have a limiting factor that I submit obviates the concern that the government expressed in this regard, and we have a very narrowly crafted rule in this case that, somewhat analogous to Pierre, that when money is paid to a government cooperator, turned over to a trustee, and the trustee distributes it in due course to the creditors, there is no actual loss, which is what is required here. And your opposing counsel relies almost exclusively on Nijuan. And how would you distinguish Nijuan? Well, Nijuan, which I have some very painful familiarity, is a case in which, first of all, there was a stipulated loss as part of the agreement at sentencing. There wasn't a situation, and Nijuan was a massive loan fraud where none of the money, in any way, shape, or form, went to somebody who was cooperating with the government. And I think, ultimately, Nijuan helps us here in saying that you ought to look at the actual facts and circumstances of the loss. So I think Nijuan, on balance, supports our position. If there are no further questions, I'll ask the Court to reverse. Thank you. The case was extremely well argued. We will take the matter under advisement.